UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | No. 6:21-CR-27-REW-HAI |
| v. | ) | RECOMMENDED DISPOSITION |
| JOHN MADISON MEADOWS & ERICA LYNN GRUBB, | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

On June 29, 2021, Defendant John Meadows, through counsel, filed a motion to suppress evidence. D.E. 31. Without objection, co-defendant Erica Grubb joined the motion. D.E. 34, 38. The government responded in opposition on the merits. D.E. 38. The Court conducted an evidentiary hearing on July 20, 2021. D.E. 41. Defendants were uncertain whether post-hearing briefing was warranted. The Court ordered that any defense brief should be filed by August 6. *Id*. No post-hearing brief was filed by the deadline.

Meadow's motion summarizes the basic facts as follows:

> Meadows and co-defendant Erica Grubbs are charged with conspiring to distribute 500 grams or more of a mixture or substance containing a detectible amount of methamphetamine (count 1) in violation of 21 U.S.C. 846 and possession with intent to distribute 500 grams or more of a mixture or substance containing a detectible amount of methamphetamine (count 2) in violation of 21 U.S.C. 841(a)(1).
>
> According to the attached citations at 12:56 am on March 20, 2021, London Police Officer J. Robinson stopped the defendants' vehicle on I-75 for "having only one headlight illuminated". Meadows was driving and co-defendant Grubbs was a passenger in the vehicle.

>Again, according to the citation, when Officer Robinson made contact with Meadows "he acted extremely nervous and I observed his carotid artery in his neck pulsating. I spoke to the male and he stated that they took a friend up to Cincinnati to see his child. Based on his actions I asked the male to exit the vehicle and step back to the back of his vehicle." Ultimately Officer Robinson claims he obtained consent to search the entire vehicle from Meadows and drugs (methamphetamine) and drug paraphernalia were found hidden in different locations in the vehicle. The defendants were arrested over an hour and a half after the initial stop at 2:39 am.

D.E. 31 at 2-3.

Defendants argue "Suppression is required as Officer Robinson extended Meadows and Grubbs' detention following the traffic stop while lacking a 'reasonable suspicion of specific criminal activity.'" D.E. 31 at 3.

At the evidentiary hearing, a single witness testified—London Police Officer Joey Robinson, who conducted the stop and arrest and wrote the citation. He was cross-examined by counsel for both Defendants. The facts are not in dispute. Rather, the issue is the interpretation of the facts and whether they indicate a constitutional violation requiring suppression of the evidence. The government bears the burden of showing that an exception to the warrant requirement applies and that the search or seizure complied in scope and duration with the Fourth Amendment. *United States v. Lott*, No. 6:17-CR-52-GFVT-HAI, 2018 WL 2348684, at *4 (E.D. Ky. Feb. 7, 2018).

## I. The Stop of Defendants' Vehicle

As an initial matter, the parties do not dispute that Officer Robinson's stop of the car driven by Meadows was constitutionally permissible because the vehicle was driving with only one functional headlight. "An officer may stop and detain a motorist so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Bell*, 555

2

F.3d 535, 539 (6th Cir. 2009). A traffic stop qualifies as a "seizure" for purposes of the Fourth Amendment. *Id*.

Officer Robinson testified at the hearing that he patrols Hal Rogers Parkway and Interstate 75. He routinely stops vehicles for violations of traffic rules, including vehicles that have fewer than two functional headlights. Concerning this case, he testified that at 12:56 a.m. on March 21, 2021, he stopped an orange Pontiac D-6 that he saw traveling south on I-75 with only one working headlight.

## II.  Whether the Stop Was Unreasonably Extended

### A.  Legal Standards

Absent reasonable suspicion, a traffic stop may last no longer than necessary to effectuate its original purpose, which is addressing the traffic violation. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). For example, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id*.

Reasonable suspicion requires more than an ill-defined hunch; it must be based on specific and articulable facts that provide an objective basis for suspecting the particular person of criminal activity. *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016). The Court must consider the totality of the circumstances and view the evidence using a common-sense approach, as understood by those in the field of law enforcement." *Id.*

The Supreme Court in *Rodriguez* explained that the "tolerable duration" of a traffic stop is determined by the seizure's "mission," *i.e.*, to address the traffic violation that warranted the stop. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

> Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. [I]n determining the reasonable duration of a stop, it is appropriate to examine whether the police diligently pursued the investigation. . . . [A] traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket.

*Id.* (citations and quotation marks omitted).

The Court clarified that, beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to the traffic stop" such as checking the driver's license, registration, and proof of insurance, and checking for outstanding warrants. *Rodriguez*, 575 U.S. at 355 (quoting *Caballes*, 543 U.S. at 408). As part of these ordinary inquiries, both the driver and any passengers may be required to exit the vehicle. *Id.* at 356. Measures related to securing officer safety are also permissible. *Id.* at 356-57.

Defendants argue that Officer Robinson "ceased pursuing the original purpose of the traffic stop and began to pursue the suspected drug trafficking activity [without any] 'reasonable and articulable suspicion that criminal activity was afoot.'" D.E. 31 at 3-4 (quoting this language from *United States v. Bonilla*, 357 F. App'x. 693, 698 (6th Cir. 2009), and stating the stop in this case was "very similar").

### B. Hearing Testimony

Officer Robinson testified that, at the time of the stop, he had no suspicion of criminal activity. The only violation he was aware of was the broken headlight. After he stopped the Pontiac, he approached the driver's side door, where he met Defendant Meadows. Robinson noticed "extreme nervousness" and Meadow's carotid artery was "pulsating." Robinson asked for Meadows's drivers license, insurance, and registration, which Meadows provided. But Meadows could not "sit still;" he kept "reaching around" him for things. Officer Robinson asked

4

Meadows where he was coming from. Meadows said Cincinnati. Robinson asked Meadows to get out and stand behind the car. Robinson said he does not always ask drivers to get out; he does so when they seem "overly nervous" or are parked too close to the line. Robinson testified that Meadows's "nervousness made me want to feel safer by taking him out [of the car]." Meadows then told Officer Robinson he had a hypodermic syringe in his pocket and was diabetic. He said the officer could search him. Robinson found a syringe in Meadows's pocket.

Officer Robinson testified this interaction raised "red flags." "Several times" before, he had encountered motorists who said they were diabetic and had syringes in their pockets, but they turned out to be in possession of illegal drugs. Robinson testified that, in his experience, most diabetic people carry a "medical pouch" with a glucometer. He had never encountered, he said, an actual diabetic who carries loose syringes in their pocket. Instead, loose syringes in the pocket have always turned out to be drug-related. Robinson said there was nothing suspicious about going to Cincinnati, but he was skeptical, because people lie to him a lot.

Officer Robinson testified that, during this conversation and his consensual search of Meadows's person, they were standing five to six feet from Meadows's car. Neither Meadows's body nor his car were blocked in. Officer Robinson told Meadows he intended to issue a verbal warning. At this point, Robinson may have checked Meadows's license, but he has no specific memory of doing that. Officer Robinson issued a verbal warning about the headlights issue. He did not issue a written "courtesy notice." He handed Meadows back his documentation.

The mission of the stop was now complete, but Officer Robinson started discussing with Meadows the prevalence of drug trafficking on I-75. Robinson said it is his "practice" to talk about drug trafficking on I-75 before asking for consent to search a vehicle. He uses this spiel

"quite often . . . to make them aware" of why he asks for consent to search. He says this conversation does not typically make people nervous if they have nothing to worry about.

After this brief conversation about drug trafficking, Officer Robinson asked Meadows for consent to search the vehicle. At this point, three to four minutes had elapsed since the initial stop. No weapon was drawn, and Meadows was not in handcuffs. Robinson was the only officer present. Robinson testified he considered Meadows free to leave at this point, although he did not tell Meadows he was free to leave. Officer Robinson testified he "regularly" asks consent to search in situations like this. Over 25 times this year already, people have declined consent, and Officer Robinson lets them leave. Officer Robinson testified he would have let Meadows leave if he had denied consent.

However, Meadows told Officer Robinson he could "search the whole vehicle" or "search the whole car." Robinson testified that Meadows gave consent without hesitation or equivocation. Robinson said he had "no idea" whether Meadows knew he had the right to refuse the request.

Another officer, named Williams, then arrived. Officer Robinson did not remember whether he had radioed Williams, but Department policy is that no vehicle searches may be done without a backup officer. Officer Robinson asked Grubb, the passenger, to exit the car. He asked her where they had been. Grubb said she did not know; she had simply been with Meadows the whole night. Robinson did not ask Grubb for any additional consent. Officer Williams stood with Defendants while Officer Robinson searched the car.

Inside, on the passenger side was a purse. Officer Robinson found several syringes inside it. Robinson said there were lots of items in the purse, and he could not remember any insulin or

6

glucose monitor. Grubb's attorney made clear at the hearing that Grubb is not separately challenging the search of the purse.

Officer Robinson moved on to searching inside the trunk, where he found a glass pipe. He said this pipe was found two to three minutes after Meadows gave consent to search the car. In all, about six to seven minutes had elapsed after the car was stopped.

Next, under the "carpet" in the trunk, Robinson found an "oval object" wrapped in duct tape. He unwrapped the object and it looked like a package of methamphetamine. Robinson said Defendants were "detained" and handcuffed at this point. No consent to search had been withdrawn.

Officer Robinson then checked under the hood. There, in the air filter compartment, he found a container with scales, spoons, baggies, and—if he remembered correctly—more syringes. The officers radioed for a supervisor. Officer Robinson said he did not run Defendants' criminal history during the stop. But he later found they had multiple traffic infractions and criminal convictions.

Officer Robinson was asked on cross-examination why the citation lists the "time of arrest" as 2:39 a.m. *See* D.E. 31-1 at 2. Officer Robinson testified that 2:39 is actually when the officers left the scene with Defendants under arrest, it was not the actual time of arrest (which was when the duct-taped object was located in the trunk). Robinson stated that nothing else in the citation was inaccurate.

When questioned by the Court, Officer Robinson testified that the events happened in quick succession, with no intervening event. Meadows's statement about the syringe in his pocket and its discovery, the headlight warning, the conversation about trafficking on I-75, and the request to search the car all happened immediately after each other.

Officer Robinson said that at the time his body camera was not working. Its replacement did not arrive for another two weeks.

### C. Analysis

The stop in this case did not violate the *Rodriguez* line of cases because Officer Robinson had reasonable suspicion of criminal drug-related activity prior to the completion of the traffic stop. As noted already, the parties agree the stop itself was lawful on account of Defendant's nonfunctioning headlight. Unlike *Rodriguez*, the purpose of addressing the traffic violation was not completed prior to Officer Robinson developing reasonable suspicion of criminal activity.

Officers "are permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (quoting *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002)).

Here, Officer Robinson noted several "red flags" prior to the completion of the "mission" of the stop (i.e., issuing the verbal warning) that provided reasonable suspicion to extend the stop for a reasonable period of time. First, Officer Robinson described Meadows as "estreme[ly] nervous" and fidgety. This included Meadows's carotid artery noticeably "pulsating" in his neck. Officer Robinson testified that Meadows's clear nervousness made him concerned for his safety which motivated him to ask Meadows to step outside the vehicle. The second red flag is Meadows volunteering the information that he had a syringe in his pocket and was diabetic. Officer Robinson testified that he has experience dealing with actual diabetics and drug traffickers who claim to have diabetes as a cover explanation for their syringes. He testified how in his experience Meadows did not come across as a legitimate diabetic. Robinson said people with diabetes usually carry a medical pouch with a glucometer. He testified he has never known

people with diabetes to carry syringes in their pockets. Instead, he has always found people with syringes in their pockets to be involved with illegal drugs.

Relying on Officer Robinson's experience, the Court finds that these red flags were sufficient to establish reasonable suspicion of criminal activity. Applying common sense to the totality of the circumstances, the two described red flags (extreme nervousness plus a syringe in the pocket) are specific and articulable facts that provide an objective basis for suspecting Meadows of being involved in criminal activity.

Given this reasonable suspicion, it was not unreasonable for Officer Robinson to extend the stop (now a *Terry* stop) long enough to have a brief conversation on drug trafficking on I-75 and ask Meadows for permission to search. As Robinson testified, he was looking in the trunk where the meth was discovered within seven minutes of stopping Meadows's car. And the consent to search was obtained about four minutes into the stop. Accordingly, the stop was not extended beyond its mission absent reasonable suspicion of criminal activity. And the ensuing *Terry* detention based on reasonable suspicion was short and diligent.

Meadows's motion likens this case to *United States v. Bonilla*, 357 F. App'x 693 (6th Cir. 2009). D.E. 31 at 3-4. The Court in *Bonilla* explained that when an officer ceases pursuit of the "original purpose of the traffic stop" and begins pursuing suspected drug trafficking activity, the officer must have a "reasonable and articulable suspicion" that criminal activity is afoot, "regardless of how short the detention was." *Id.* at 697-98. "Under the Fourth Amendment, even the briefest of detentions is too long if the police lack a reasonable suspicion of specific criminal activity." *Id.* (quoting *United States v. Urrieta*, 520 F.3d 569, 578 (6th Cir. 2008)). The Court in *Bonilla* found the asserted facts to be inadequate for reasonable suspicion. These facts included (1) "Bonilla's nervous appearance, the vehicle's size and out-of-state license

plate," (2) Bonilla's "intended destination" of Columbus, Ohio, (3) Bonilla's and his passenger's statements that they were going to "Columbus for vacation" and "Columbus to visit friends," respectively, and (4) "the fact that Bonilla could not initially recall his passenger's last name or the amount of time he had known her." *Id.* at 698. These were not enough. But here, the presence of a syringe in Meadows's pocket (accompanied by extreme nervousness) was a stronger instigator of reasonable suspicion. Clearly, syringes are used for drugs, whether legal or illegal. The officer's experience told him a syringe in an allegedly diabetic person's *pocket* corresponds to illegal drug use. The suspicious facts here were less neutral than in *Bonilla*.

At the hearing, Meadows's counsel referred to cases named *Royer*, *Sharpe*, and *Lott*. The Court assumes the first two are *Florida. v. Royer*, 460 U.S. 491 (1983), and *United States v. Sharpe*, 470 U.S. 675 (1985). These cases concern the length of investigative *Terry* stops based on reasonable suspicion. This case began with a vehicle stop based on probable cause of a traffic violation. Once Officer Robinson issued the verbal warning, the "mission" of the stop was over. And the investigation then became a *Terry* stop based on reasonable suspicion of activity involving illegal drugs.

The Court in *Royer* noted that, during a *Terry* stop, officers "may not carry out a full search of the person or of his automobile or other effects" absent a warrant or consent. *Royer*, 460 U.S. at 499. Here, it is uncontested that Meadows gave Officer Robinson consent to search his person and then consent to search his vehicle. *Royer* also explained that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* The problem in *Royer* was that the stop developed into a full-blown detention without intervening development of probable cause. Here, Meadows and Grubb were detained, but only after Officer Robinson found a package of methamphetamine in the trunk pursuant to consent

10

search during a valid *Terry* stop that had lasted only about three minutes. Probable cause of drug trafficking preceded Defendants' detention. Defendants have not argued that they were detained prior to the discovery of the package of meth in the trunk.

Turning to *Sharpe*, the Court there explained, "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686. Here, Officer Robinson talked with Meadows about drug trafficking on I-75 for about two minutes before asking permission to search the car. The search turned up a package of meth after about three minutes. Given these short time frames, Officer Robinson diligently pursued his investigation during the period their interaction qualified as a *Terry* stop. The conclusion here is the same as in *Sharpe*: "Clearly this case does not involve any delay unnecessary to the legitimate investigation of the law enforcement officers. [Defendants] presented no evidence that the officers were dilatory in their investigation." *Id*. at 687.

The case of *United States v. Lott*, No. 6:17-CR-52-GFVT-HAI, 2018 WL 2348684, at *4 (E.D. Ky. Feb. 7, 2018), from this Court, is more directly applicable because it involved a traffic stop. Lott's motion to suppress was denied, and that denial was upheld by the Sixth Circuit. *United States v. Lott*, 954 F.3d 919 (6th Cir. 2020). As described by the Court of Appeals, that case "hinge[d] on the timing of the computerized warrant search." *Id*. at 924. While the officer waited for the computerized warrant search to complete, he engaged the defendant in conversation, during which the defendant admitted possessing marijuana. "Prior to the marijuana admission, Lott's nervousness was all [the officer] had to go on and that was insufficient independent reasonable suspicion of criminal activity to prolong the stop." *Id*.

11

In this case, Officer Robinson had more to go on than just Meadows's nervousness. Meadows admitted he had a syringe in his pocket and claimed unconvincingly (based on Officer Robinson's experience) to suffer diabetes. These facts comprised a more important "red flag" than nervous behavior alone and distinguish this case from the mere nervousness noted in *Lott*. In any event, the stop in *Lott* was upheld because the warrant check (which courts include within the "mission" of any traffic stop) was not yet complete when defendant admitted marijuana possession. *Lott*, 954 F.3d at 925. Thus, these cases cited by the defense do not counsel suppression of the evidence in this case.

### D. Good Faith

In the alternative, even if Officer Robinson had violated the Fourth Amendment in this case, suppression would not be warranted. The exclusionary rule is a harsh remedy intended to deter *flagrant* police misconduct. *See generally Herring v. United States*, 555 U.S. 135 (2009); *United States v. Leon*, 468 U.S. 897 (1984). "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Davis v. United States*, 564 U.S. 229, 237 (2011). "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144. *Leon*, *Davis*, and *Herring* indicate the flagrancy or culpability of law enforcement's conduct must be assessed before a court orders suppression of evidence. *Davis*, 564 U.S. at 238; *Herring*, 555 U.S. at 143; *Leon*, 468 U.S. at 911. Isolated negligence does not justify suppression. *Davis*, 564 U.S. at 239. And the Sixth Circuit has said that the "crucial finding" to support suppression is that the police misconduct is "'sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the

justice system.'" *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010) (quoting *Herring*, 555 U.S. at 144).

Here, any unconstitutional conduct by Officer Robinson was not flagrant or culpable. He made a valid probable-cause stop. He quickly completed the mission of the stop but engaged Meadows in conversation for two or three minutes based on what is at least arguably a reasonable suspicion of criminal activity. He obtained consent without coercion and found methamphetamine about three minutes later. Suppressing the evidence here would not be a net benefit to society. There was no flagrant police misconduct to be deterred.

### III. Conclusion

For the reasons discussed above, the undersigned **RECOMMENDS** that Defendants' join motion to suppress (D.E. 31) be **DENIED.** The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the District Judge. Any objection must be filed within **fourteen days** of the entry of this order. Failure to object per Rule 59(b) waives a party's right to review. Upon expiration of that fourteen-day period, this matter will be submitted to Judge Wier for his consideration.

This the 12th day of August, 2021.

Signed By:
*Hanly A. Ingram*
United States Magistrate Judge