UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:21-CR-27-REW-HAI |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| JOHN MADISON MEADOWS and ERICA LYNN GRUBB, | ) ) ) | |
| Defendant. | ) | |

*** *** *** ***

This matter comes before the Court on Magistrate Judge Ingram's Recommended Disposition regarding a motion to suppress evidence uncovered during a vehicle search. DE 43. Defendant John Meadows has filed objections to the Magistrate Judge's findings and petitions the Court to overturn the ruling. DE 44. The United States filed a response in support of the recommendation. DE 47.

Having thoroughly reviewed the full record, to include the hearing transcript (DE 46) and all briefing, the Court finds the evidence properly subject to suppression. The Court thus **GRANTS** DE 31 and **REJECTS** DE 43. The Officer at issue measurably extended an initially valid traffic stop beyond appropriate temporal limits. He did so without reasonable suspicion. The resulting consent occurred during an improper seizure, not a consensual encounter. Further, this is but one instance of the Officer's standard and intentional practice of tagging stop-elongating consent requests onto the end of traffic stops. The Court finds exclusion appropriate in light of the Fourth Amendment violation here and the Officer's flawed and systemic approach.

1

## I.   Background

Defendant John Meadows faces two counts: (1) conspiracy to distribute 500 grams or more of a mixture or substance containing a detectible amount of methamphetamine, in violation of 21 U.S.C. § 846; and (2) possession with intent to distribute 500 grams or more of a mixture or substance containing a detectible amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). DE 1. Erica Grubb is co-defendant on both.

Meadows, later joined by Grubb without objection, filed a motion to suppress 1.5 pounds of methamphetamine discovered during a traffic stop. DE 31. The government responded in opposition. DE 38. On referral, Judge Ingram conducted an evidentiary hearing, at which the Court heard brief arguments from both sides and testimony of sole witness Officer Robinson regarding his stop and search of the defendants' car. DE 41, 46.

No one questions Judge Ingram's recitation of the facts, accurate as always.  The Court accepts that description, and adds any facts of consequence:

Officer Joey Robinson, who joined the London police force in late 2018, was patrolling I-75 one night when he encountered the defendants. DE 46, at 9, 12. John Meadows was driving an orange Pontiac G6 on I-75 South when, around 12:56 a.m., Robinson stopped the car for "having only one headlight illuminated." DE 31-1 at 1; DE 31 at 2. Erica Grubbs was in the passenger seat at the time of the stop. DE 31 at 2. When Robinson reached the driver's side of the car, he noted that Meadows exhibited "extreme nervousness," that he observed "[Meadows's] carotid artery . . . pulsating," and that Meadows "[c]ouldn't really sit still in the seat." DE 46 at 13. After obtaining routine documents from Meadows, Officer Robinson then asked him to exit the vehicle and step toward the back of the car. *Id.* at 14.  Robinson testified that he asked Meadows to step out of the car for safety reasons. *Id.* at 29. As Meadows and Robinson walked toward the back of the car,

Meadows volunteered that a hypodermic syringe lay in his pocket and that he was diabetic. *Id.* at 14. Meadows then offered to let Robinson retrieve the syringe, which Robinson did. *Id.*

Continuing toward the back area of the car, Robinson discussed the headlight violation with Meadows and soon determined to issue him only a verbal warning for the violation. *Id.* at 16. At this point, the men were behind the Meadows car and separated by several feet. Robinson was the lone officer on scene. *Id.* at 17. Robinson told Meadows of the verbal warning and then handed Meadows's documents back to him. Without pausing, Robinson then launched into a discussion of drug trafficking issues along I-75. *Id.* at 17 ("Q: [A]fter you gave the documents back, then what, if anything did you say to Mr. Meadows?; A: I discussed the drug trafficking up and down I-75."); *id.* at 30 (referencing his discussion as "Usually I explain to people that, you know, Interstate 75, especially southbound, there's a lot of drugs that travel down 75 from the bigger cities"); *see also id.* at 24 ("Q: [After returning the documents, d]id you tell him he was free to go?; A: I did not."). Following the exchange regarding drugs on the highway, Robinson testified to the following: "[I] asked [Meadows] if anything was inside the vehicle. He stated no. And then I asked for consent to search the vehicle. He stated, 'Search the whole vehicle.'" *Id.* at 17. Robinson proceeded to search and ultimately found the methamphetamine that supports the Indictment.

Robinson's approach that night was no one-off. He engages in the described post-stop spiel "[q]uite often" after "a minor traffic stop" on I-75. *Id.* at 37. Robinson considers the interstate to feature a "high volume" of drug crimes. *Id.* at 11. He called this "procedure where you give a warning, give the documents back, and ask for consent to search the vehicle" something he does "regularly." *Id.* at 18-19. His recitation of the trafficking problem on the corridor is "[t]o make people aware . . . And then if I ask for consent, they'll know why I'm giving it, instead of just catching them off guard." *Id.* at 37. Importantly, Robinson's work focus is the area of I-75. He

3

makes twenty stops per week. *Id.* at 9. Robinson estimates that he's given forty-two courtesy notices this year. Further, he reports that twenty-five of the persons he has put through the consent colloquy have denied him consent. Robinson did not estimate the number of searches his approach has produced. In his view, the stopped person is, at the point of consent, free to leave and the consent discussion is merely a "consensual encounter" between him and the citizen. *Id.* at 31; *see also id.* at 30 ("Q: After they're free to leave, you then go into this practice where you tell them about drug trafficking [on the highway] and then ask for consent to search the car?; A: Yes").

A few additional notes of prominence: Robinson viewed the syringe on Meadows as being somewhat suspicious. He had encountered this before, a person carrying a lone syringe and claiming to be diabetic. Such a scenario, which Robinson had seen "several" times, had not proven authentic. Instead, the persons citing diabetes had actually been in possession of drugs. *Id.* at 14-15. The record contains nothing regarding Robinson's training and only the few anecdotal and unquantified nuggets from Robinson's experience. The Court observes that Robinson, under oath, did not view the situation as creating reasonable suspicion of criminal activity: "I wouldn't call it reasonable suspicion, but a level of suspicion." *Id.* at 29; 36 ("I wouldn't say that the syringe brought reasonable suspicion[.]"). Finally, the entire event (stop to consent) happened over just a few minutes. Robinson estimated he had obtained consent within "three to four minutes." *Id.* at 18.

Judge Ingram found that Robinson did have adequate cause, under *Terry* standards, to extend the stop briefly for the purpose of obtaining consent. DE 43 at 8. He also rejected any suppression basis, under the *Leon/Davis/Herring* rubric. *Id.* at 12-13. The defense objected to both findings. The United States, in its first brief of detail, DE 47, supported the recommendation and

4

also attempted to present a non-seizure, consensual encounter theory. The Court reviews the matter de novo.

## II. Standard of Review

The standard of review for district courts when reviewing a report and recommendation is found in 28 U.S.C. § 636. When objections are raised to the magistrate judge's report, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); Rule 59(b)(3). The district court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b)(1).

## III. Discussion

Defendants filed a motion to suppress all evidence discovered and seized during the search of their vehicle. The motion argues that Robinson measurably extended Meadows's detention following the completion of the mission of the traffic stop, while lacking reasonable suspicion of criminal activity. DE 44. The Court agrees.

### a. Scope of the Traffic Stop

The first step in this inquiry is to determine the scope of the initial traffic stop, to gauge whether that scope was exceeded. A traffic stop qualifies as a seizure and thus is subject to the constitutional requirements of the Fourth Amendment. *See United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009). An officer may legally stop a car when probable cause exists to believe that a traffic violation has occurred. *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007). The parties do not contest that Robinson had probable cause to stop the vehicle because Meadows was driving at night with only one headlight illuminated. DE 43.

During a traffic stop, all the officer's actions must reasonably relate to the purpose of the original stop to fall within its scope. *See Bell*, 555 F.3d at 541. An officer may permissibly conduct "ordinary inquiries incident to the traffic stop." *Illinois v. Caballes*, 125 S. Ct. 834, 837 (2005). Such inquiries usually encompass things like checking a driver's license, querying for wants and warrants, and inspecting automobile registration or proof of insurance. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). However, the Court indicated that even a minor action taken by a police officer in furtherance of a "general interest in criminal enforcement" must, if it extends the timing of the stop, be independently supported by individualized suspicion. *Id.* at 1616; *see also United States v. Lott*, 954 F.3d 919, 924 (6th Cir. 2020). The critical inquiry to identify a Fourth Amendment violation asks, "at what point in time did the purpose of the traffic stop end and the detention of the driver . . . begin?" *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008).

Officer Robinson pulled over the Pontiac, asked Meadows for his documentation, and requested that Meadows exit toward the back of the car. Robinson testified that he could not recall whether he ran a search on Defendant's driver's license or license plate number but did recall surrendering Meadows's documents to him while standing near the rear of the vehicle. DE 46 at 28, 16. Per the Officer's own testimony, this was the point at which the original mission of the traffic stop concluded; Officer Robinson communicated the verbal warning and considered the Defendant free to go at that time. DE 46 at 30. Thus, any elongation of the stop beyond that point must have been supported by reasonable suspicion to satisfy the Fourth Amendment's mandate.

b. *Reasonable Suspicion*

Turning to the extension of the stop, the Supreme Court has held that "a seizure justified only by a police-observed traffic violation becomes unlawful if it is prolonged beyond the time

6

reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez*, 135 S. Ct. at 1612 (cleaned up) (citation omitted). In *Rodriguez*, the Court compared a traffic stop to a *Terry* stop and stated that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . ." *Id.* at 1614 (cleaned up) (citations omitted); *see Terry v. Ohio*, 88 S. Ct. 1868 (1968). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed; whichever comes first." *Lott*, 954 F.3d at 923-24 (quoting *Rodriguez* and *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020)). The terminal point analysis "is a bright line rule." *Lott*, 954 F.3d at 924 (quoting *Boles*, 949 F.3d at 256).

"A seizure can be extended if 'something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot.'" *Lott*, 954 F.3d at 923 (quoting *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012)). "Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (citation, ellipsis, and internal quotation marks omitted). Reasonable suspicion is analyzed from a "totality of the circumstances" perspective, by which evidence is viewed "using a common sense approach, as understood by those in the field of law enforcement." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). An officer's experience and specialized training may properly influence the calculus. *See Shank*, 543 F.3d at 315. A court should not artificially view factors in isolation, and the standard is below the probable clause floor. *Id.*

Here, the Magistrate Judge relied on two factors to find that Robinson had developed a reasonable suspicion of criminal activity during the stop and before its completion: (1) Meadows's nervous demeanor when Robinson approached the car; and (2) the presence of the empty syringe

7

in Meadows's pocket. Relying on Robinson's interpretation of the syringe, Judge Ingram found these "red flags" sufficient to establish reasonable suspicion of criminal activity. DE 43 at 9.

The Magistrate Judge contrasted the case circumstances with those from *United States v. Bonilla*. In *Bonilla*, the district court found the following facts sufficient to create reasonable suspicion: (1) a nervous appearance and out-of-state license plate, (2) the defendant's intended destination of Columbus, Ohio, (3) the defendant's statements that he was traveling both "for vacation" and "to visit friends," and (4) that the defendant could not recall the last name of his girlfriend of three years. *United States v. Bonilla*, 357 F. App'x 693, 698 (6th Cir. 2009). The Sixth Circuit reversed, finding these factors largely innocuous and thus insufficient to support reasonable suspicion. One of those items—nervousness—is also present here, yet of relatively little consequence when unaccompanied by other relevant facts. "A driver's nervousness when stopped is often common and, therefore, given little weight." *Id.* (citing *United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008) (finding "nervousness inherently unsuspicious")). Individuals often become nervous when stopped by police "even when they have nothing to hide." *Richardson*, 385 F.3d at 631. Nervousness is a pertinent factor, but a reedy, nondispositive one.

And the syringe? Several matters stand out to the Court. First, the record contains no information regarding Robinson's training. Thus, while accepting that he had been on the force for about two and a half years at the time of the stop, the Court has no reason to credit Robinson's "specialized training," because there is no record of any specialization. *See Shank*, 543 F.3d at 315. The Court cannot treat the officer as entitled to deference based on training (or capable of detecting things that elude the untrained) where it has no information about training. Robinson's field experience regarding the syringe/diabetes/illegal drugs linkage has some weight. However, the most Robinson could say was that he had seen the false-diabetic story "several" (no number)

8

times in his short career. Some things undercut the inference. First, Robinson did not link the syringe to any particular criminal activity. A syringe could indicate unlawful drug use, though less likely trafficking as a logical matter. Robinson did not say what crime he suspected, making the analysis more difficult. There is no evidence that Meadows was impaired or that he operated his vehicle dangerously, cutting against a use crime. The record does not indicate (either way) that the syringe had drugs loaded into it. Further, although Robinson claims a true diabetic would have other related gear (like a glucose device and medication pouch) such an empirical claim surely calls, as to reliability, for more than a lay policeman meeting an unknown number of actual versus false diabetics. Lastly, the fact that Meadows volunteered the needle and gave an innocent explanation is a mitigating point in the overall mix.

Surveying *Terry* cases for comparison is difficult because the analysis is case specific.[1] In the Court's view, Robinson had one thin and discounted factor (nerves) and one ambiguous factor (a syringe). Although Judge Ingram cited "several" red flags, the Court sees only these two. Tellingly, Officer Robinson, the master of this stop, did not view the information before him as supplying reasonable suspicion. DE 46, at 29 ("I wouldn't call it reasonable suspicion[.]"). His subjective view does not decide things, but given the justificatory reliance on Robinson's purported fake-diabetic linkage, his assessment of the inferential strength matters. Weighing the key issue de novo, the Court finds that a single disclosed syringe paired with "inherently unsuspicious" nervousness, viewed under the "totality of the circumstances," is not here enough to meet the requirements of the Constitution. *See United States v. Marxen*, 410 F.3d 326, 329 (6th

---

[1] *See, e.g., United States v. Garrido*, 467 F.3d 971, 982 (6th Cir. 2006) (cataloguing *Terry* cases); *United States v. Winters*, 782 F.3d 289, 301 (6th Cir. 2015) ("Because the concept of reasonable suspicion is somewhat abstract, one determination will seldom be useful precedent for another, and our reasonable suspicion cases do not offer a coherent principle that resolves the question we face.") (cleaned up) (citations omitted).

9

Cir. 2005) ("In considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot."). Any measurable stop elongation did not have the saving power of reasonable suspicion.

### c. Consent to the Search

Having established that no reasonable suspicion existed for the extended detention in this case, the only other possible basis for constitutional justification lies in the consent (and its circumstances) given by Meadows as to the search. The question of whether consent to a search was freely and voluntarily given "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 93 S. Ct. 2041, 2048 (1973). To be valid, consent must be "unequivocally, specifically, and intelligently given, uncontaminated by any duress or coercion." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). "The government bears the burden of proving, through 'clear and positive testimony' that the consent to search was given voluntarily." *United States v. Beauchamp*, 659 F.3d 560, 570 (6th Cir. 2011) (quoting *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998)). Courts should consider the age, intelligence, and education of the suspect; whether the suspect understands the right to refuse consent, the length and nature of the detention; and the use of coercive or punishing conduct by the police in determining whether the consent was voluntary. *Bustamonte*, 93 S. Ct. at 2047. The parties did not separately litigate the voluntariness issue, but Meadows's motion targeted the *Rodriguez* rule not coerciveness yielding consent.

Even assuming that the consent was voluntary, the Court must still determine whether illegal detention tainted the consent. *See Beauchamp*, 659 F.3d at 573. The Sixth Circuit has repeatedly held that "evidence obtained pursuant to the consent to search must be suppressed" if

"the consent was given after an illegal seizure." *Id.*; *see also United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003). "[F]or the seized evidence to be admissible, not only must the consent be valid but the causal chain between the illegal seizure and the consent must be broken to avoid the consequences of the exclusionary rule." *Beauchamp*, 659 F.3d at 573 (cleaned up) (quoting *Lopez-Arias*, 344 F.3d at 629). The stain of an unconstitutional seizure may be cleansed when the defendant's consent is the "the product of an intervening act of free will." *United States v. Grant*, 920 F.2d 376, 388 (6th Cir. 1990). Factors to be considered in this analysis include the length of time between the illegal seizure and the consent, the presence of intervening circumstances, the purpose and flagrancy of the official misconduct, and (if applicable) whether the officers read the suspect his Miranda rights before he consented. *See Kaupp v. Texas*, 123 S. Ct. 1843, 1847 (2003).

Here, there was no temporal gap between the illegal detention and the consent request. Indeed, the very foundation of the illegal detention was Robinson's post-stop colloquy aimed specifically toward gaining Meadows's consent. There also were no intervening circumstances here; Robinson handed Meadows his documents and immediately began discussing drugs on the highway followed by the investigational query and request to search. The third factor is the most relevant here, largely because of Robinson's consistent practice of asking for consent to search a vehicle without respect to any basis for a lengthened stop. Plainly, Robinson has a strategic and regular design, and "the purpose of the [detention] seems to be 'investigatory,' undertaken as an 'expedition for evidence in the hope that something might turn up.'" *Beauchamp*, 659 F.3d at 574 (citing *Brown v. Illinois*, 95 S. Ct. 2254, 2262 (1975)). Robinson testified that he very frequently recites his spiel about drug trafficking on I-75 and does so "to make people aware" of why he asks for consent to the search. The Officer acted in the belief that he did not have reasonable suspicion,

11

which further shows the direct relationship between the *Rodriguez* violation and the tainted consent. The Court sees no daylight between the decision to elongate the stop and the immediately secured consent to search. The first taints the contemporaneous second.[2]

The Government weaves in, as a last redoubt,[3] the notion that Robinson did not violate *Rodriguez* because the interaction between Robinson and Meadows had become "consensual" by

---

[2] *See United States v. Palomino-Chavez*, 761 F. App'x 637, 644 (7th Cir. 2019) ("Here, the first two factors are dispositive. We have already determined Palomino-Chavez was illegally seized. That illegality was 'ongoing' when he gave his consent, thus 'foreclosing the possibility that the consent was sufficiently attenuated from the unlawful conduct as to purge the taint.'"). *United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005); *see also McGann v. Northeast Ill. Reg. Commuter RR Corp.*, 8 F.3d 1174, 1184 (7th Cir. 1993) ("When statements and conduct evidencing consent to a search are given contemporaneously with the illegal seizure, with no break in the causal chain, the actions of the person seized are not free from the taint of the unlawful detention and are thus insufficient to show consent."); 4 Search & Seizure § 9.3(e) (6th ed.) ("Of course, obtaining consent to a search can hardly be deemed a part of the 'mission' of a traffic stop, as discussed in *Rodriguez v. United States*, and thus ought to be a basis for suppression should it 'measurably extend the duration of the stop.'").

[3] The cases centrally cited by the United States in its objection brief are all pre-*Rodriguez* and distinguishable from the instant case. In *Ohio v. Robinette*, the Supreme Court held only that a police officer's subjective intent in stopping a vehicle is largely irrelevant to a finding of probable cause and that voluntariness of consent does not require, per se, that a motorist be told, post-stop, that he is free to leave. 117 S. Ct. 417, 420 (1996). The decision in *Robinette* did not hold that consent cures an illegal detention; stop-elongation was not addressed. In *Burton*, the officer promptly asked Burton, parked illegally, for consent to search. *United States v. Burton*, 334 F.3d 514, 516 (6th Cir. 2003). The Sixth Circuit found the question and sequence reasonable under the circumstances and related to the officer's safety in the situation. *Id.* at 517-19. Importantly, it did not find that the officer required no reasonable basis to ask for a consent to search Burton or his vehicle *before the mission of the stop concluded*. The officer never got to stop finality in *Burton*. Finally, in *Aguilera-Pena* the officer asked if there was illegal contraband in the vehicle, noticed nervous behavior, and asked for consent to search, which was given. *United States v. Aguilera-Pena*, 426 F. App'x 368, 369 (6th Cir. 2011). The Court, though at one point finding no "unnecessarily prolonged . . . detention," held that "[o]nce the initial stop was lawfully completed, the extraneous questions were appropriate, as was the request for consent to search the car." *Id.* at 371. The continued validity of this holding is in serious doubt following *Rodriguez*'s command that "[a] seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez*, 135 S. Ct. at 1612 (cleaned up) (citation omitted). None of these cases changes the outcome here.

the time Meadows allowed the search. DE 47, at 1 ("the encounter had . . . become consensual"). Robinson himself held the view. DE 46 at 25, 37. This theory does exist in the cases, and a stop, given the right attributes, can morph into a consensual encounter. *See, e.g.*, *United States v. Triana*, 760 F. App'x 768, 772 (11th Cir. 2019) ("This Court, however, has recognized two limited exceptions to [the *Rodriguez*] rule: first, when officers have an 'objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring'; and second, if the facts indicate that 'the initial detention has become a consensual encounter.') (citation omitted).

The Tenth Circuit outlines its analysis:

> The fundamental question we ask in these cases is whether "a reasonable person under the circumstances would believe [he] was free to leave or disregard the officer's request for information." *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005) (quoting *United States v. Elliott*, 107 F.3d 810, 814 (10th Cir. 1997)). We follow a bright-line rule that requires the driver's documents to be returned before the stop may be considered a consensual encounter, recognizing that merely handing back documents is not "always sufficient to demonstrate that an encounter has become consensual." *Bradford*, 423 F.3d at 1158. Factors that we have found relevant to our analysis include:
>
>> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.
>
> *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005) (quoting *United States v. Zapata*, 997 F.2d 751, 756–57 (10th Cir. 1993)). While this list is not exclusive and no one factor is dispositive, we focus on "the coercive effect of police conduct, taken as a whole on a reasonable person." *Id.*

*United States v. Gomez-Arzate*, 981 F.3d 832, 842 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 2572 (2021), *and cert. denied sub nom. Martinez-Torres v. United States*, 141 S. Ct. 2837 (2021).

The Sixth Circuit has not announced a similar list of factors in the precise context but has found nonconsensual encounters in circumstances comparable to those identified by the Tenth Circuit. *See, e.g.*, *United States v. Williams*, 615 F.3d 657, 664 (6th Cir. 2010) (finding a seizure partially because the officers were "in uniform and arrived in a marked police car"); *United States v. Johnson*, 620 F.3d 685, 690-91 (6th Cir. 2010) ("A reasonable person in Johnson's position would not have felt free to leave when the officers ordered him to stop. There were two officers, they had arrived in marked police cars, they announced themselves as police several times, and they yelled at Johnson to 'stop' and 'stay right there where he was' as they advanced toward him in the dead of night."); *United States v. Lewis*, 843 F. App'x 683, 688 (6th Cir. 2021) ("Examples of circumstances that indicate a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'") (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *United States v. McCall*, 433 F. App'x 432, 437 (6th Cir. 2011) ("Our court has further elaborated factors for determining whether a person would feel free to leave: '(1) [T]he purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as . . . whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police . . . .'") (citing *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003)).

The Court finds that the Robinson-Meadows interaction, unquestionably rooted in a seizure, did not transform into a consensual encounter at the end of the stop. To be clear, Robinson stopped Meadows at 1 a.m. on the side of I-75. Robinson almost immediately got Meadows's papers and then removed Meadows from the car and took him to the rear of the vehicle. Nearly as

14

soon as that occurred, within mere minutes, Robinson returned the papers and gave Meadows the verbal admonition. Robinson then, missing no beats, launched into his scripted drug-trafficking declamation, asked Meadows if he had contraband, and asked Meadows for consent to search. He did not tell Meadows the stop was over or that Meadows could leave. He did not communicate, verbally or otherwise, that the stop had concluded. Rather, Robinson seamlessly moved from the stop mission to an investigatory mode, describing serious crime and then questioning Meadows about his own potential culpability and involvement. No reasonable person, removed from his car, at 1 a.m., on the side of I-75, under the control of a uniformed policeman, stopped by a cruiser, facing the circumstances of this interaction, would feel free to unilaterally break off contact and depart. The situation was dark, isolated, and without witnesses (save the passenger). Robinson reported that twenty-five people have refused him consent in these circumstances. He did not report that anyone had simply walked away without participating in the consent colloquy.

That Robinson did not tell Meadows he could go is not dispositive but surely is a factor. The Supreme Court itself has stated, "Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Berkemer v. McCarty*, 104 S. Ct. 3138, 3148 (1984); *see also Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009) ("Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave."); *United States v. Branch*, 537 F.3d 582, 588 (6th Cir. 2008) (noting, as part of seizure analysis, undisputed proof that officer "told him [defendant] he was free to leave after receiving the warning ticket and his driver's license"). Express permission is not a per se requirement for a stop to end, but the Court must sift the circumstances for what a reasonable motorist here would perceive.

To the Court, looking at all circumstances, only a person with the rarest temerity would simply walk away here before getting some type of leave, some type of reasonable concluding signal, from the officer in control. Robinson claims the interaction instantly pivoted from one of seizure to one of consent. That may be his subjective view, as the authority controlling the sequence and events. The Court rejects the theory that any reasonable stop target would share the view. Meadows remained seized at the time of the consent colloquy.

### d.  Good Faith Exception

Finally, the remedy. The Supreme Court has explained that the exclusionary rule is "not able to 'cure the invasion of the defendant's rights which he has already suffered.'" *United States v. Leon*, 104 S. Ct. 3405, 3412 (1984). The rule is a judicial remedy "designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra*, 94 S. Ct. 613, 618 (1974). "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances *recurring or systemic negligence*." *Herring v. United States*, 129 S. Ct. 695, 702 (2009). The remedy is not an automatic consequence of a Fourth Amendment violation and applies only when the benefits of deterrence outweigh the costs of exclusion. *See Leon*, 104 S. Ct. at 3412. The Supreme Court has rejected application of the exclusionary rule where there was good faith reliance on a defective warrant, *Leon*, 104 S. Ct. 3405, where there was good-faith reliance on a statute later declared unconstitutional, *Illinois v. Krull*, 107 S. Ct. 1160 (1987), and where a police officer relied in good-faith on mistaken information, *Arizona v. Evans*, 115 S. Ct. 1185 (1995). Further, the Court has "effectively created a balancing test by requiring that in order for a court to suppress evidence following the finding of a Fourth Amendment violation, 'the benefits of deterrence must outweigh the costs.'" *United States v.*

*Master*, 614 F.3d 236, 243 (6th Cir. 2010) (citing *Herring,* 129 S. Ct. at 700). This not a case of good faith reliance on mistaken information, case law, or a defective warrant.

Robinson violated Meadows's rights here. The Court concedes that the temporal reality (that the stop, in toto, spanned merely three to four minutes, pre-consent), ameliorates. However, *Rodriguez* was clear to reject the concept of de minimis delay as an elongation loophole. *Rodriguez*, 135 S. Ct. at 1615-16. Still, the particularly troubling circumstance here is Robinson's modus operandi. His regular practice is to append the consent colloquy to traffic stops. Robinson staked no reliance on cause; rather, he leaned on the concept of a consensual encounter dovetailing with the stop. Further, the numbers figure into the *Herring/Davis* balancing test. Robinson stops twenty citizens per week. He has given forty-two written warnings in 2021. He claims that twenty-five times, in 2021, a motorist has declined consent in this post-stop planned colloquy.[4] The record does not reveal the actual number of times Robinson has pursued his strategy. Presumably, some of those might have included situations with a proper *Terry* basis. However, given that Robinson focuses not on his justification but rather on the consensual putative tone of the post-stop dynamic, the Court has grave concern about the reach and effect of the Officer's systematic approach.

Some might see the improper, but brief, extension of a traffic stop, for just a few moments of discussion and questioning, as a minor encroachment, mere pennies added to the bill. The Court instead sees a trespass of constitutional import, a significant and measurable step across the right

---

[4] Given the statistics on the number of persons that typically grant consent, this unknown number is frightful. *See* Roseanna Summers, Vanessa K. Bohns, *The Voluntariness of Voluntary Consent: Consent Searches and the Psychology of Compliance*, 128 YALE L. J. 1962, 2007 (2019) (finding that about 90% of individuals will hand over their phone when asked by a person of some authority and comparing to a study done surveying automobile drivers in which researchers found that "between 85-90% [of drivers] consent to searches of their vehicle [by police]").

17

boundaries of government that weakens the freedoms of all involved. Suppression is warranted to deter this practice—one Robinson systemically implements as citizens pass his watch in London.[5]

### IV.   Conclusion

For the foregoing reasons, the Court **GRANTS** DE 31 and **REJECTS** as stated the conclusion in DE 43.

This the 13th day of October, 2021.

Signed By:
*Robert E. Wier*   /s/ REW
United States District Judge

---

[5] Though not litigated, the Court views Robinson's handling of Grubb's purse as problematic and a negative procedural signal. Meadows purportedly gave Robinson unbounded consent to search the vehicle. Robinson took that and used it to search the purse of Grubb, the passenger. *See* DE 46, at 21 ("I found Ms. Grubb's purse. Inside of the purse was several syringes."). Typically, consent hinges on authority, and the law would not validate a driver's consent to search the closed bag of a passenger. *See United States v. Humphrey*, 30 F. App'x 596, 601 (6th Cir. 2002). Robinson did not get permission from Grubb. DE 46, at 40. This vignette simply is part of the record and, to the Court, a useful data point in the calculus.